UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| BELTRAMO ENTERPRISES II, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:04CV00065 AGF |
| | ) | |
| UNITED FIRE & CASUALTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the motion of Plaintiff Beltramo Enterprises II, Inc., for summary judgment.[1] For the reasons set forth below, this motion shall be granted.

## BACKGROUND

Plaintiff in this diversity action seeks to recover money allegedly owed by Defendant United Fire & Casualty Insurance Company under an insurance policy issued by Defendant covering a building owned by Plaintiff. Defendant insured the building in question against damage for a total of $435,200. The effective dates of the policy were January 1, 2001 to January 1, 2002. Plaintiff filed a claim under the policy for damage to the building's slate roof resulting from a windstorm on July 3, 2001. It is undisputed that this was a loss covered by the policy; however, the parties disagreed on the amount owed by Defendant. Plaintiff requested $180,000 for replacement of the roof, while Defendant

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

offered $20,000 to repair the roof. The parties invoked the appraisal clause of the policy to determine the amount of loss resulting from the windstorm. This clause provides as follows:

> If we [Defendant] and you [Plaintiff] disagree on the value of the property or the amount of loss ("loss"), either may make written demand for an appraisal of the loss ("loss"). In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of the written demand for appraisal. The two appraisers will select an umpire. . . . The appraisers will state separately the value of the property and amount of loss ("loss"). If they fail to agree, they will submit their differences to the umpire. The umpire shall make an award within 30 days after the umpire receives the appraisers' submissions of their differences. A decision agreed to by any two will be binding.
>
> Each party will:
>
> 1. Pay its chosen appraiser; and
> 2. Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.

Def. Ex. 1.

By letter dated February 16, 2003, Plaintiff's attorney, Scott Templeton, asked Mike Stewart, a claims adjuster with Defendant, to confirm his (Mr. Stewart's) representation that he did not believe Defendant would contend that the last sentence of the appraisal clause applied to a situation where there was an unfavorable result of the appraisal process. Mr. Templeton also wrote that Plaintiff had selected Dan Wilt, "a real estate person in Macon," as its appraiser. Pl.'s Ex. at 25.

Mr. Stewart responded by letter dated March 7, 2003, that the appraisal process was for resolution of the disputed amount of damage resulting from the windstorm, not

for resolution of any coverage issues, issues Defendant was not waiving if any existed. Mr. Stewart further wrote that the appraisal process

> is used to settle a dispute regarding a difference of opinion in regard to the cost of repairing damages covered under the policy. In summary, we will agree to be bound by an appraisal decision, providing the decision is arrived at without interference of either party, and is based upon a determination of damages suffered by wind only, which in this case is the peril involved.

Pl.'s Ex. at 28-29.

Defendant chose Dan Colter as its appraiser, and the two appraisers met at the property on June 30, 2003. Mr. Stewart, Mr. Templeton, and John Beltramo, Plaintiff's president, were also present. Mr. Wilt determined that Plaintiff's damages were $180,000, which represented the difference in the market value of the house prior to the windstorm and afterwards. On July 23, 2003, Mr. Colter submitted his determination that "the total cost to repair the existing wind damage to the roof surface is $20,000 dollars." Pl.'s Ex. at 36.

On September 5, 2003, Mr. Templeton wrote a lengthy letter to Mr. Stewart and to Scott Gaddis, a claims supervisor for Defendant. Mr. Templeton set forth his understanding that on June 30, 2003, while at the property, the two appraisers had agreed that the measure of damages was the difference in the market value of the house prior to the windstorm and afterwards. Mr. Templeton wrote that when at the property, he had mentioned that Plaintiff had been trying to sell the property even before the windstorm, and that before the storm, there was nothing about the condition of the roof that Plaintiff would have had to disclose to a potential buyer. Mr. Templeton wrote that those present

3

further discussed that after the storm, "potential buyers (one in particular) would routinely calculate what they would be willing to pay for the property and then deduct the cost of a new roof from the bid price." The letter went on to state that Mr. Wilt "corroborated the statement about buyers deducting the cost of the new roof under the circumstances." Pl.'s Ex. at 39-43.

Mr. Gaddis responded to the letter with his own letter dated January 13, 2004. He stated that he did not share Mr. Templeton's understanding that the appraisers had agreed about the measure of damages. Pl.'s Ex. at 44-45. Correspondence between Mr. Templeton and Mr. Gaddis concerning the matter continued. By letter dated October 16, 2003, Mr. Gaddis wrote, in relevant part:

> We are certainly interested in completing the appraisal process, as outlined in the policy. You may call Don [Coulter] to confirm that his position is the damages from this loss are limited to the repairs he previously outlined [in his letter of July 23, 2003]. The next step is for Don and the insured's appraiser to get together and agree on an umpire.

Pl.'s Ex. at 48. On January 13, 2004, Mr. Gaddis wrote:

> As I have said many times in the past, there was no agreement . . . during any previous meetings. Your appraiser inspected, and our appraiser inspected.
>
> There appears to have been a meeting of minds regarding the two appraisers submitting the opinions to a third appraiser and that we would agree to the decision between two of the three appraisers. . . .
>
> This is a clear case of first party property damage, which should be settled relatively quick. . . . We are comfortable with whatever decision is made. Are you not?"

Pl.'s Ex. at 52. And on February 20, 2004, Mr. Gaddis wrote, "Again, as we have previously indicated, whatever decision two out of the three appraisers agree on (the

4

umpire being the 3rd appraiser), we will accept as the amount to resolve this loss." Pl.'s Ex. at 55.

The two appraisers chose John Briscoe as umpire. On March 30, 2004, Mr. Briscoe issued a written decision. He stated that he had met with the two appraisers, and that each explained the measure of damages he had used to determine the loss involved. Mr. Briscoe concluded that Mr. Wilt was using the right test, and that accordingly, Defendant should pay Plaintiff $180,000 for the loss. Mr. Briscoe added, "If either of you needs for me to take any other action or make any other kind of written ruling, please let me know." Pl.'s Ex. at 70. On April 29, 2004, Plaintiff made demand upon Defendant for $180,000.

By letter dated September 10, 2004, counsel for Defendant informed Plaintiff that Defendant considered the appraisal void for failure to comply with the terms of the appraisal clause in the policy, in that (1) the appraisers did not make separate calculations of both the value of the property and the amount of the loss; (2) the appraisal clause was only intended to resolve a dispute as to the amount of damages resulting from the windstorm and not to resolve liability or coverage issues; and (3) Mr. Wilt's signature did not appear on Mr. Briscoe's March 30, 2004 decision letter. Defendant also relied upon the last line of the appraisal clause providing that if there were an appraisal, Defendant still retained the right to deny the claim. Lastly, Defendant wrote that even if the appraisal process had been properly conducted, the amount owed Plaintiff was not $180,000, but some lesser amount due to depreciation and the fact that the policy was written on a actual cash value basis, not a replacement value basis. Defendant offered to

5

settle the matter for $75,000. Pl.'s Ex. at 75-76.

Plaintiff filed this action on January 20, 2005, seeking $180,000 plus pre-judgment and post-judgment interest; and penalties pursuant to Mo. Rev. Stat. §374.420, including attorney's fees, for vexatious refusal to pay. The Case Management Order (CMO) governing the case directed that the case proceed in stages, with Phase I and discovery limited to the issue of whether the appraisal of the loss is binding on the parties. The CMO set out the timetable for a motion for summary judgment by Plaintiff on this issue, and noted that following a ruling on the motion, the Court would schedule a status conference to discuss the schedule for remaining issues. Doc. #11.

Now before the Court is Plaintiff's motion for summary judgment in the amount $180,000, plus interest at the rate of nine percent from April 29, 2004, the date of Plaintiff's demand. In response to Plaintiff's motion, Defendant argues that the appraisal is void for essentially the same reasons set forth in the letter of September 10, 2004. Defendant adds another reason why the appraisal is void: Mr. Wilt was not an impartial appraiser, because he was the real estate agent and/or broker who facilitated the sale of Plaintiff's property after the windstorm and therefore had a direct interest in the outcome of the appraisal process.

Defendant also argues that Plaintiff cannot maintain this action, in light of a policy provision that legal action could not be brought against Defendant unless there had been full compliance with the terms of the policy. In support of the argument that, in any event, an amount less than $180,00 plus interest is owed, Defendant has submitted the affidavits of one of its claims supervisors and one of its claims adjusters, each attesting

that the policy was written on an actual cash value basis not a replacement cash value basis, and that based upon the life expectancy of the roof, depreciation, and the applicable deductible, Plaintiff was due significantly less than $180,000. Def.'s Ex 2. at ¶16; Def.'s Ex. 3 at ¶16.

Supplemental discovery and briefing were permitted on the issue of appraiser Wilt's partiality. The record now establishes that in approximately May 2001 Plaintiff put the property in question up for sale for $1.8 million. The property sold on July 2, 2004, for $1.4 million in "as is" condition, with Mr. Wilt acting as Plaintiff's real estate agent and/or broker. A "Special Agreement" attached to the sales contract stated as follows: "Buyer is aware and accepts that roof has had storm damage and that a pending insurance claim has not been settled. Buyer is accepting roof in as is condition, and agrees that seller is entitled to all insurance payments, if any." Ex. 2 to Def.'s Supp. Br. A commission of $65,000 was paid to Mr. Wilt by Plaintiff.

In a supplemental brief in support of its motion for summary judgment, Plaintiff argues that there is no evidence or indication that Mr. Wilt had any interest in the appraisal process or the outcome of this litigation. Rather, Plaintiff argues, the evidence simply reflects that Mr. Wilt had a separate business arrangement with Plaintiff. Plaintiff further argues that in any event, Defendant's challenge to Mr. Wilt's qualifications to serve as an appraiser in this case comes too late. Plaintiff points to the reference in the letter of September 5, 2003, that Plaintiff had been trying to sell the property in question, and maintains that Defendant had ample opportunity to make inquiry of Mr. Wilt and challenge his credentials before the appraisal process proceeded. Plaintiff asserts that

7

"[i]t is inconceivable to suggest that [Defendant] did not know that [Mr. Wilt] was a real estate agent and that he had made attempts to sell the home at issue. If it were somehow oblivious to this fact, it passed up the opportunity to make such inquiry." Doc. #30 at 4.

Defendant argues in its supplemental brief that the appraisal is void because Mr. Wilt was the "commissioned real estate agent/broker who facilitated the sale" of Plaintiff's property, and therefore had "a direct financial interest in the outcome of the appraisal process making him a biased and partial appraiser." Def.'s Supp. Br. at 1. In a footnote, Defendant states that the fact that the home sold for more than twice the amount for which it was insured ($485,000) "is strong evidence of misrepresentation in the procurement of insurance." Id. n.1.

## DISCUSSION

Summary judgment may be granted if, viewing the evidence in the light most favorable to the non-moving party, there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 59(c); Highwoods Props., Inc. v. Exec. Risk Indem., Inc., 407 F.3d 917, 920 (8th Cir. 2005). There is no dispute that Missouri law governs this diversity action.

The Court first concludes that all of Defendant's arguments that the appraisal is void, with the exception of the argument based upon Mr. Wilt's qualifications, are without merit. It is abundantly clear from the record that Defendant agreed to be bound by the decision of two out of three appraisers, counting the umpire as an appraiser, with respect to setting the amount of the loss. Defendant cannot now challenge the validity of the appraisal decision on the ground that it decided an issue of liability rather than

damages.  See Equity Mut. Ins. Co. v. Campbell, 886 S.W.2d 221, 223 (Mo. Ct. App. 1994) (insurer could not challenge appraisers' decision as to the amount of loss from fire covered by policy on the ground that the appraisal process was flawed because the appraisers failed to inspect all of the damaged property and failed to consider that some of the damaged property had been repaired).

Furthermore, the record establishes that the appraisal process set forth in the policy was substantially complied with, despite the technical deficiencies to which Defendant now points.  A party to an insurance contract which provides for an appraisal procedure must show substantial compliance with that procedure in order to enforce the appraisal.  Sec. Printing Co. v. Westchester Fire Ins. Co. of NYC, 221 S.W. 430, 433 (Mo. Ct. App. 1920).  From the record it is evident that appraiser Wilt determined that the roof was a total loss, and that Plaintiff was therefore entitled to damages based on a determination of the cost of a new roof.  As Defendant, itself, acknowledges, Defendant's appraiser, Mr. Colter, did not disagree that a new roof would cost $180,000, but he did not agree that the wind damage to the roof was a total loss.  It is also evident from the record that Defendant continued to agree to be bound by the decision of the umpire and any one appraiser after Defendant knew appraiser Wilt's assessed loss amount and the manner in which that amount was reached.

Nor can Defendant escape the binding effect of the process which it endorsed by asserting that appraiser Wilt failed to state separately the value of the property or failed to sign the umpire's decision letter.  From the record there is no dispute that Defendant's own appraiser also provided nothing more than the loss calculation, and notwithstanding

9

such a failure on the part of both appraisers, Defendant thereafter agreed, in writing, to be bound by the decision of the umpire and any one appraiser.

With regard to the failure by Mr. Wilt to sign the umpire's letter, the Court notes that there is nothing in the policy requiring that the decision of the umpire be signed by the appraiser with which he agrees; the policy states only that "the umpire shall make an award within 30 days after the umpire receives the appraisers' submissions of their differences." It further states that "[a] decision agreed to by any two will be binding," but nowhere requires such a decision be signed by the two who are in agreement. The umpire represented in his letter of decision that he agreed with the determination by Mr. Wilt, and Defendant has no evidence to the contrary. Even if such a signature were required, it is undisputed that the umpire expressly invited the parties to advise him if the parties needed him "to take any other action or make any other kind of written ruling," and Defendant made no such request. Defendant is now estopped to assert that the decision of the umpire is void for having failed to obtain the signature of the appraiser with which he agreed, especially where, as here, the policy does not require any such signature.

With regard to Defendant's argument that the appraisal process was void due to Mr. Wilt's relationship with Plaintiff at the time of that process, the Court first notes that, as Defendant argues, "an arbitrator, directly or indirectly interested in the result of the arbitration" is incompetent to participate in an appraisal and renders any such appraisal void. Schwartzman v. London & Lancashire Fire Ins. Co., 2 S.W.2d 593, 594 (Mo. 1927) (en banc) (umpire who was a stockholder in an investment company whose employees

acted as agents for the defendant insurer was indirectly interested in the outcome of the case, and therefore appraisal was void); see also Orr v. Farmers Mut. Hail Ins. Co. of Mo., 201 S.W.2d 952, 957 (Mo. 1947) (appraisal for hail damage was void because appraiser was in the employ of the insurer when he was acting as appraiser). The Court concludes that as Plaintiff's agent and/or broker for the sale of the subject property, at the time that he was acting as appraiser in this case, Mr. Wilt had a sufficient interest in the matter to disqualify him from the appraisal process.

The question remains, however, whether Defendant waived its right to object to Mr. Wilt's participation in the appraisal process. Upon review of the record, the Court concludes that there is sufficient evidence that Defendant was at least put on notice that Mr. Wilt was involved with Plaintiff in the attempt to sell the property. Significantly, nowhere does Defendant dispute that at the time of the appraisal process, Defendant knew that Mr. Wilt was the real estate agent and/or broker for the sale of Plaintiff's property. The Court agrees with Plaintiff that under these circumstances, the time for Defendant to challenge Mr. Wilt's qualifications was at the time he was designated by Plaintiff, or at least at some point prior to the selection of the umpire. See Equity Mut. Ins. Co., 886 S.W.2d at 224. Defendant's attempt to distinguish Equity Mutual on the ground that in that case the competence of the appraiser was challenged, rather than his integrity, is unpersuasive.

Lastly, the Court agrees with Plaintiff that Defendant cannot now argue that the amount of loss set by the appraisal process is subject to reduction based upon depreciation. See Abercrombie v. Allstate Ins. Co., 891 S.W.2d 838, 840 (Mo. Ct. App.

11

1994) (appraisal amount of loss from fire damage properly fixed amount insured was entitled to despite insurer's argument that it could withhold a certain sum of deprecation until insured returned the house to its pre-fire condition). Indeed, in its letters dated March 7, 2003, January 13, 2004, and February 20, 2004, Defendant represented that if the two appraisers can agree on a damage amount, which is determined to be caused by a peril insured against, they would gladly agree to accept that amount and accept that decision "as the amount to resolve this loss."

## CONCLUSION

The Court concludes that Defendant is bound by results of the appraisal process, and that Plaintiff is entitled to judgment in its favor on Phase I of this case in the amount of $180,000 plus statutory interest from April 29, 2004.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment on Phase I of this case is **GRANTED**. [Doc. #16]

**IT IS FURTHER ORDERED** that in accordance with the CMO in this case, a status conference is set for **Tuesday, April 4, 2006, at 1:30 p.m.**, to discuss any and all remaining issues.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of March, 2006.